## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF IOWA

IN RE:                                    )
                                          )          Chapter 11
BAILEY RIDGE PARTNERS, LLC,               )
                                          )          Bankruptcy No. 17-00033
        Debtor.                           )

### FINAL RULING ON AMENDED MOTION TO EXTEND THE STAY AND JOINT MOTION TO STAY TO PENDING SOUTH DAKOTA MATTER

These matters came before the Court for final hearing on May 2, 2017 in Sioux City, Iowa. Don Molstad appeared for Debtor Bailey Ridge Partners, LLC ("Debtor"). Bill Miller appeared for Dubuque Bank & Trust Company ("Dubuque Bank"). Wil Forker appeared for Floyd "Chet" Davis. Chad Thompson appeared for Verlyn Nafe. Frank Barron appeared for Paul Engle. David Updegraff appeared for Nicole Nearman née Grubb. Jessica Uhlenkamp and Allyson Dirksen appeared for Jerry Ruba. Steve Huff appeared for First Dakota National Bank ("First Dakota"). Brad Kruse appeared for the Official Committee of Unsecured Creditors. The Court received exhibits and heard testimony to complete the record started at the initial hearing on February 16, 2017. These matters are ready for final ruling. This is a core proceeding under 28 U.S.C. § 157(b)(2)(G).

### STATEMENT OF THE CASE

Debtor's members personally guaranteed Debtor's debt. Dubuque Bank sued Debtor's members on their personal guarantees of Debtor's loans. Debtor and

Debtor's members ask the Court to stay that litigation.  Jerry Ruba, a shareholder

or interest holder in Debtor, was sued by First Dakota on a separate, but related,

loan in United States District Court in South Dakota.  Mr. Ruba argues that that

suit should also be stayed because he took out the loan for Debtor's benefit in

reliance on Debtor's commitment to repay the loan.  Mr. Ruba asks the Court to

stay the South Dakota litigation.  The Court finds that it is proper to stay both the

guarantor litigation and the South Dakota litigation.

## BACKGROUND AND ARGUMENTS

Debtor is a pig feeding and housing operation.  Dubuque Bank is Debtor's

primary lender with a lien on Debtor's personal property, real estate (worth about

$11.5 million), and proceeds securing a debt of about $11.4 million (using the

contract rate of interest).  Debtor incurred this this debt to Dubuque Bank to

refinance from a past lender and to make improvements to its facilities.  As a part

of these financial arrangements, Floyd Davis, Paul Engle, Jason Grubb, Nicole

Nearman, and Verlyn Nafe ("the Guarantors" or "the Members") guaranteed this

debt with Dubuque Bank.[1]

---

[1] Although Mr. Ruba is named in Debtor's amended motion to extend the stay, he
is not a guarantor on Dubuque Bank's loan.

2

## I.    The Guarantor Litigation

About a year ago, Debtor started having trouble making payments to

Dubuque Bank.  In April 2016, Dubuque Bank sent Debtor a notice of default.  In

July 2016, Dubuque Bank sued the Guarantors in state court ("the Guarantor

litigation").  In December, Dubuque Bank, Debtor, and the Guarantors participated

in mediation, which was unsuccessful.  Dubuque Bank restarted foreclosure

actions in January and Debtor filed bankruptcy, starting this case and staying the

foreclosure actions against Debtor.  Debtor filed its Chapter 11 plan of

reorganization on April 28, 2017.

The Guarantors ask the Court to stay the Guarantor litigation.  The

Guarantors argue that allowing the lawsuits to continue against them is adverse to

Debtor's ability to reorganize.  In particular, that Dubuque Bank, after getting a

judgment against the Guarantors, may be able to levy against the Guarantors'

equity in Debtor.  They also note that litigation among the Guarantors will

probably arise without a stay.  The Guarantors argue that, especially because

Debtor has sufficient collateral to cover Dubuque Bank's claim, this is an unusual

circumstance that warrants staying the Guarantor litigation.

Dubuque Bank resists.  It argues that Debtor and the Guarantors have not

shown unusual circumstances needed to extend the stay.  Dubuque Bank argues

that it has the right to proceed against the Guarantors whether or not Debtor's cash

flow or collateral is sufficient for its claim.  Dubuque Bank also argues that there is

no evidence that the Guarantors are unified, that they are being asked to contribute

equity, or that they are involved in Debtor's ongoing operation.  Dubuque Bank

argues that, as a result, the Guarantors are separate from Debtor and the stay

should not be extended.

## II.  The South Dakota Litigation

Before Debtor borrowed money from Dubuque Bank, it was involved in a

lawsuit in federal court in South Dakota.  That lawsuit started when First Dakota

sued Jerry Ruba, who had or has a minority interest in Debtor,[2] on a promissory

note in United States District Court in South Dakota ("the South Dakota

litigation").  Mr. Ruba then filed a third-party complaint against Debtor, arguing

that Debtor is the real party in interest that owes First Dakota.  Mr. Ruba's third-

party complaint against Debtor was stayed by virtue of the automatic stay.  First

Dakota's lawsuit against Mr. Ruba on the loan that it made to him, however, was

not.

Mr. Ruba—and interested parties Nicole Nearman, Floyd Davis, Jack

Grubb, Verlyn Nafe, and Paul Engle—ask the Court to stay the South Dakota

---

[2] It is unclear whether Mr. Ruba continues to own a stake in Debtor.  At one point
he did own a minority share, but Debtor's disclosure statement—filed only a few
days before this hearing—shows that he is not an owner.  Mr. Ruba said that he is
an owner and had no idea why the disclosure statement would indicate otherwise.

4

litigation between First Dakota and Mr. Ruba.  Mr. Ruba argues that that suit

should also be stayed because he took out the loan for Debtor's benefit in reliance

on Debtor's commitment to repay the loan.  He argues that he did not get the

benefit of the bargain, that the money he borrowed went directly to Debtor, and

that Debtor was supposed to pay First Dakota back on the note.  He argues that,

because Debtor was supposed to pay the loan, a judgment against him would

effectively be a judgment against Debtor.  He argues that, if the litigation is not

stayed, he will suffer costs and will seek compensation from Debtor for these costs.

First Dakota resists.  First Dakota argues that Mr. Ruba is the only signatory

on the relevant loan and that Mr. Ruba is the party that owes the debt to First

Dakota—not Debtor.  First Dakota argues that any agreement between Debtor and

Mr. Ruba about who was supposed to pay the note does not bind First Dakota.

First Dakota concludes that it should be permitted to continue its lawsuit in federal

Court in South Dakota against Mr. Ruba to collect on its loan to him.

### III.   The Temporary Stay

The Court previously held a hearing on these issues on February 16, 2017.

The Court ruled that, on that record, a temporary stay was warranted.  In re Bailey

Ridge Partners, LLC, No. 17-00033 at 8–9 (Bankr. N.D. Iowa February 23, 2017).

The Court stayed the Guarantor litigation in Iowa State Court and the Ruba

litigation in federal court in South Dakota.  The Court found, however, that a

permanent stay was not warranted because the record was incomplete.  Id.  As a

result, the Court set this final hearing:

> to determine whether "the identity between parties is so great as to
> make a judgment against the third-party defendant . . . in effect . . . a
> judgment or finding against the debtor," and so warrant the extending
> the stay under § 362 or . . . injunction under § 105.

Id. at 9 (citation omitted).  In particular, the Court found that:

> more evidence on the relationship between each member and Debtor,
> each member's role within Debtor, each member's willingness to
> provide further financing to Debtor, the effect on the estate if a lawsuit
> goes forward against a member, the effect on the estate if judgment is
> entered against that member, and any other equitable considerations, is
> needed to determine whether the stay should extend to some or all of
> the members.

Id. at 8–9.  The Court held the final hearing and finds the following facts based on

the evidence and testimony presented, as well as the evidence and testimony

presented at the initial hearing on February 16, 2017.

## FINDINGS OF FACT

### I.    The Guarantor Litigation

All of the Guarantors, except Jason Grubb, testified at the hearing.  All of

the testifying Guarantors were optimistic about Debtor's financial prospects

moving forward and its likelihood of reorganization.  The Court finds that the

Guarantors' optimism is well-founded on the evidence presented to date.

In July 2016, Debtor entered into a five-year contract with Seaboard Foods

of Iowa, LLC ("Seaboard") to provide pig feeding and housing services ("the

Seaboard Contract"). Under the Seaboard Contract, Debtor will receive $34 per nursery space and $36 per finishing space. These payments begin when a pig starts occupying a space and continue, whether or not a pig continues to occupy the space, for the life of the contract. Debtor's nine different facilities have about 25,000 nursery spaces and 25,000 finisher spaces total. Before the Seaboard contract, Debtor did not have any long term contracts. The Seaboard Contract is valuable because it guarantees income once Seaboard's pigs are housed in Debtor's facilities.

When Debtor filed bankrutpcy, Debtor was housing and feeding Seaboard pigs as well as other entites' pigs. Now, Debtor exclusively houses and feeds pigs under the Seaboard Contract. Because of the guaranteed income under the Seaboard contract, this exculsivity is advantagous for Debtor. Debtor's path forward for a reorganization relies on the continuation of the Seaboard Contract.

Under the Seaboard Contract, filing a Chapter 11 bankruptcy is a default and Seaboard may terminate the contract. Similarly, the legal action against it in South Dakota (now stayed as to Debtor) and its default in its relationship with Dubuque Bank likely constitutes "an Event of Default" under the Seaboard contract. Nevertheless, Debtor's representatives have talked to Seaboard about the Chapter 11 filing—as well the South Dakota case and its status with Dubuque Bank before the Contract was finalized—and Seaboard has agreed to continue under the

7

Seaboard Contract.  Its actions bear this out: Seaboard's pigs remain at Debtor's facilities and more Seaboard pigs continue to arrive at Debtor's facilities.

Debtor's current cash flow projections show that, now that all of Seaboard's pigs are in Debtor's facilities, Debtor's revenue exceeds its expenses, not including debt service.  When debt service is included, however, Debtor's projections show a negative cash flow.

The record is undisputed, however, that Debtor may be able to increase its revenue under the Seaboard Contract by changing some facilities from finishing facilities to nursery facilities.  Such changes would increase Debtor's overall pig feeding and housing capacity and, consequently, its revenue.  Debtor would need to find financing for these facility changes.  Debtor estimates that, even with the additional debt service to pay the financing for the facility changes, the increased revenue would enable Debtor to service its debt and have a positive cash flow.

The Guarantors commented on Debtor's past financial difficulties and noted that, with the Seaboard Contract now in place—pigs being delivered and payments being made—they believed Debtor was in a strong position to successfully reorganize.  The Guarantors also testified about their individual expertise and roles in Debtor's operation, their willingness to put forward additional funds if necessary, and their commitment to Debtor's reorganization.

Ms. Nearman owns 60% to 70% of Debtor.  She is a managing member along with Mr. Engle and Mr. Davis.  Ms. Nearman is on-site at Debtor's pig feeding facilities almost every day.  She works 50–90 hours a week at the facilities.  She is paid very little, if at all, for this work.  It was clear from her testimony that Ms. Nearman's work at the sites is vital to Debtor's continued operation.  She is involved in maintaining the facilities, overseeing employees, and keeping Debtor's books.  In addition to this day-to-day work managing and operating Debtor's facilities, Ms. Nearman has shown substantial financial commitment to Debtor.  She has put about $60,000 into Debtor within the last year.  In particular, she financed Debtor's payroll in the month after Debtor filed bankruptcy.

Ms. Nearman also testified about Jason Grubb's involvement.  Mr. Grubb lives in Colorado and owns and operates a construction company.  Mr. Grubb has performed construction work at Debtor's facilities and put the profits from that work back into the Debtor's operations.

Mr. Davis testified about his involvement in Debtor.  He owns about 5% of Debtor.  His initial investment was transferring a hog facility he owned called "the Hawkeye site," to Debtor.  He testified that he has personally worked on Debtor's hog sites and intends to stay active in Debtor.  He testified that he will make further investment into Debtor if necessary to keep Debtor operating and successful.

9

Mr. Nafe testified about his involvement.  Mr. Nafe no longer owns stock in Debtor but nevertheless intends to stay involved.  He works on one of Debtor's hog sites 4–9 hours a week depending on the need.  He has personally contributed $10,500 into Debtor along with another $3,000 for the retainer of Debtor's bankruptcy counsel.  He testified that he would sue Debtor if judgment was entered against him on his guarantee.  He testified that it is in his best interest if Debtor continues operating.

Mr. Engle testified about his expertise is in mechanical work—particularly the ventilation systems at Debtor's hog sites.  Mr. Engle has invested $380,000 into Debtor but almost none of that has been repaid.  Mr. Engle also provided a listed of contributions he has made to Debtor, which reflects regular financial assistance to Debtor over the years.  Most recently, he helped overcome a payroll shortfall in August 2016 and made other contributions through April, 2017.

In general, the Court finds that the Guarantors were unified and committed to Debtor's reorganization effort.  They have been, and continue to be, willing to invest time, expertise, and money to that effort.  That commitment is further evidenced by their contributions during Debtor's struggles over the past year.

## II.    The South Dakota Litigation

The South Dakota litigation is about the relationship between Mr. Ruba, Debtor, and First Dakota.  First Dakota was the lending institution that initially

10

worked with Debtor and helped get Debtor started. Mr. Ruba was a part of the
initial discussions between First Dakota and Debtor's owners about starting the
business. Kevin Haselhorst, a senior vice president at First Dakota, testified. Mr.
Ruba also testified. The following facts are based on their testimony and the
documents admitted into evidence.

Before Debtor was formed, Jack Grubb owned hog barns. He lost the hog
barns through foreclosure with another bank. He had time to redeem that property,
however, and approached Mr. Ruba for help. He asked Mr. Ruba to take out a loan
to help him redeem the hog barns. It appears that Debtor was formed at least
partially out of an effort to redeem and monetize these hog barns. Jack Grubb
already owed Mr. Ruba $664,581.30 on a previous loan.

As Debtor formed the pig feeding business, there were multiple meetings
between what would be Debtor's members, Mr. Ruba, and First Dakota. In March
2011, everyone came together to finalize and sign the relevant documents that had
been negotiated ("the March 2011 meeting"). At the March 2011 meeting, Mr.
Ruba, Mr. Grubb, Ms. Nearman, Mr. Nafe, Mr. Davis, Mr. Haselhorst, an
additional First Dakota representative, and David Updegraf were present. Mr.
Updegraf was present because he was hosting the meeting as Debtor's counsel.

First Dakota offered a two-loan package at the March 2011 meeting. The
first loan was for $5.6 million to Debtor and Debtor's owners. The second loan

was $500,000 to Mr. Ruba personally. This second loan was secured by Mr. and

Ms. Ruba's Iowa farmland. Mr. Ruba did not receive any of the $500,000 loan. It

went straight to Debtor from First Dakota. In exchange, Mr. Ruba received a 7–

8% initial ownership interest in Debtor.

This loan arrangement was not Mr. Ruba's idea. He did not ask First Dakota

for money to invest in Debtor. Mr. Ruba wanted to see if he could get paid back

by Mr. Grubb. During negotiations, First Dakota suggested that, if Mr. Ruba took

out a loan for Debtor—in his name and secured by his property—he could receive

an ownership stake in Debtor in exchange. First Dakota told Mr. Ruba that, unless

he agreed to the personal loan, First Dakota would not make the larger loan to

Debtor. Mr. Ruba understood that signing the documents was the only way that

Mr. Grubb could keep his hog operation and earn money to repay the $664,581.30

he owed to Mr. Ruba. The March 2011 meeting was the last day that Mr. Grubb

could redeem the foreclosed hog barns with Mr. Ruba.

At the same time, Debtor and Mr. Ruba also entered into an agreement at the

March 2011 meeting ("the Agreement"). The Agreement specifies that Debtor—

not Mr. Ruba—would make payments to First Dakota on Mr. Ruba's $500,000

loan. Everyone reassured Mr. Ruba that Debtor would repay the $500,000 First

Dakota loan. The Agreement between Debtor and Mr. Ruba also provided for the

transfer of his $664,581.30 account receivable from Mr. Grubb to Debtor in

12

exchange for a promissory note from Debtor for $664,581.30. As a result, now Debtor, not Mr. Grubb, owes Mr. Ruba the $664,581.30. This is in addition to Debtor's commitment to repay First Dakota on the $500,000 personal loan.

First Dakota representatives attending the March 2011 meeting were aware of the Agreement. Everyone at the meeting reviewed the Agreement. Ms. Nearman signed the Agreement on behalf of Debtor and Mr. Ruba signed for himself. First Dakota did not sign that particular Agreement, but everyone assured Mr. Ruba that Debtor would follow through on the Agreement.

Mr. Ruba did not read all of the documents because all the bankers and lawyers at the meeting reassured him and encouraged him to sign the loan. He testified that he was not concerned about the details of the documents because they all believed it was a short term loan that Debtor would repay quickly. Debtor reaffirmed that it would repay the loan Mr. Ruba was taking out from First Dakota. It encouraged him to sign the documents. Mr. Ruba thought that Debtor would make the payments because the bankers were writing the two notes and putting all the money into Debtor's promising operation.

In 2014, Debtor refinanced the $5.6 million loan with Dubuque Bank. Mr. Ruba's $500,000 loan, however, was not refinanced or paid off. Debtor has made some interest payments on the $500,000 loan but almost the entire the balance remains unpaid. Mr. Ruba has occasionally asked First Dakota to take a discount

on the loan, but First Dakota has refused.  Mr. Ruba and First Dakota have

negotiated multiple extensions of the loan.  The hope was that Debtor could start

making regular payments.

Mr. Ruba defaulted on the loan in June 2015.  First Dakota entered

mediation with Mr. Ruba.  Some of Debtor's members were at this mediation.  At

that mediation, Debtor discussed paying Mr. Ruba, who would then pay First

Dakota, but that did not occur.  This is consistent with other statements that

Debtor's members have made acknowledging that Debtor is obligated to pay the

$500,000 note under the terms of the Agreement.

First Dakota eventually sued Mr. Ruba in United States District Court for the

District of South Dakota on the $500,000 note.  Mr. Ruba responded by filling a

third-party complaint against Debtor.  That complaint alleged that Debtor had

failed to perform under the Agreement—in particular, that Debtor had not paid the

$500,000 First Dakota loan or the $664,581.30 promissory note.

The United States District Court in South Dakota granted Mr. Ruba

summary judgment on his third-party complaint and awarded him a judgment

against Debtor for $664,581.30 plus interest, totaling $851,271.59.  This judgment

did not address Debtor's commitment to pay the $500,000 First Dakota loan.

The $664,581.30 debt that Debtor agreed to pay Mr. Ruba was intended to

be secured by a mortgage on some of Debtor's Iowa property.  However, the

14

intended mortgage was never completed.  Mr. Ruba's third-party complaint against

Debtor was automatically stayed when Debtor filed bankruptcy.  First Dakota's

lawsuit against Mr. Ruba, however, continued until this Court temporarily stayed

the South Dakota litigation pending final decision.  In re Bailey Ridge Partners,

LLC, No. 17-00033, at 8–9 (Bankr. N.D. Iowa February 23, 2017).

Mr. Ruba testified that, if the South Dakota litigation proceeds, and First

Dakota receives a judgment and forecloses on his property, his farming operation

would be disrupted.  That disruption would be costly for Mr. Ruba.  Mr. Ruba

testified that he would seek compensation for this disruption and the resultant cost

from Debtor.  Mr. Ruba also testified that he would consider investing money into

Debtor under the right conditions, but had not made firm plans to do so.

## CONCLUSIONS OF LAW AND ANALYSIS

"The automatic stay does not, in general, apply to actions against third

parties."  Nat'l Bank of Ark. v. Panther Mountain Land Dev., LLC (In re Panther

Mountain Land Dev., LLC), 686 F.3d 916, 921 (8th Cir. 2012).  There are,

however, two sources of authority for the Court to stay lawsuits against third

parties: the Court may extend the stay under 11 U.S.C. § 362 or enjoin the lawsuit

through its authority under 11 U.S.C. § 105.  See id. 921–27.

Under § 362, the automatic stay may extend to third parties when there are

"unusual circumstances"—in particular where "the identity between parties is so

15

great as to make a judgment against the third-party defendant . . . in effect . . . a

judgment or finding against the debtor." Id. at 923 (internal quotation marks

omitted) (alteration in original).  "[A] nonbankrupt codefendant may be protected

by section 362(a)(1) if extension of the stay contributes to the debtor's efforts of

rehabilitation or the debtor and nonbankrupt defendant/guarantor are closely

related." In re Metro Square, No. 4-88-2117, 1988 WL 86679, at *3 (Bankr. D.

Minn. Aug. 10, 1988).

The Eighth Circuit has written, however, that "where the proposed action

involves only third parties and no estate property, and where an 'unusual-

circumstances' 'exception' would be needed to justify extension of the automatic

stay, § 105 is the more appropriate source of authority for assessing the propriety

of a stay. . . . [A] stay issued pursuant to that section should be treated as an

injunction." In re Panther Mountain, 686 F.3d at 926.   Here, Debtor made its

motion under § 362.  Because the relief requested is substantively identical,

however, the Court will follow In re Panther Mountain and treat Debtor's motion

to extend the stay as a motion to enjoin the subject lawsuits under § 105.

In analyzing a motion to enjoin a lawsuit under § 105, this Court has said

that "[t]he power to enjoin creditors' actions against a co-debtor or guarantor

should only be used in limited circumstances where a determination is made that

failure to so enjoin would adversely affect the bankruptcy estate and pressure the

16

debtor through that third party." In re Three Seas Realty II, L.L.C., No. 10-00948

S, 2010 WL 2857598, at *3 (Bankr. N.D. Iowa July 19, 2010) (quoting River

Family Farms, Inc. v. Federal Land Bank of Omaha (In re River Family Farms,

Inc.), 85 B.R. 816, 819 (Bankr. N.D. Iowa 1987)) (internal quotation marks

omitted). "[C]ourts have granted injunctions, at least on a temporary basis, to

restrain actions against a principal of the debtor upon a showing that the non-

debtor's time, energy and commitment to the debtor are necessary for the

formulation of a reorganization plan." Id. at *4 (quoting Fowler v. C.H. Masland

& Sons (In re Fowler Floor & Wall Covering Co., Inc.), 93 B.R. 55, 57 (Bankr.

M.D. Pa. 1988)) (internal quotation marks omitted). "A preliminary injunction is

only warranted if the debtor can show a substantial and adverse impact by the

action on the debtor's ability to reorganize." Id. (citing Gathering Rest., Inc. v.

First Nat'l Bank of Valparaiso (In re Gathering Rest., Inc.), 79 B.R. 992, 1000

(Bankr. N.D. Ind. 1986)). In deciding whether to enjoin lawsuits under § 105, the

Court considers the following factors:

> (1) whether there is a likelihood of successful reorganization;
> (2) whether there is imminent irreparable harm to the estate in the absence of an injunction;
> (3) whether the balance of harms tips in favor of the moving party; and
> (4) whether the public interest weighs in favor of an injunction.

Id. (quoting Nevada Power Co. v. Calpine Corp. (In re Calpine Corp.), 365 B.R.

401, 409 (S.D.N.Y. 2007)) (internal quotation marks omitted). Extending the stay

is warranted where there is a "sufficient nexus" between a debtor corporation and its members and an extension of the stay would "contribute to the debtor's reorganization efforts." See In re Metro Square, 1988 WL 86679, at *5. This is especially so where there is credible testimony from the members that they "would be willing to inject new capital into the partnership or otherwise contribute financial to the reorganization effort." Id.

Here, Debtor and Debtor's members have asked the Court to stay Dubuque Bank's suits against them on their guarantees of Debtor's debt to Dubuque Bank. Mr. Ruba has separately asked the Court to stay the South Dakota litigation against him on his $500,000 loan from First Dakota—but the other investors have now joined or at least voiced support for his request. The Court will first consider these factors with respect to the Guarantor litigation. The Court will then consider these factors with respect to the South Dakota litigation.

## I.    The Guarantor Litigation

The Court addressed the relevant factors in its previous ruling granting a temporary injunction. The Court adopts and repeats those finding here, supplemented by the additional record that has been developed on the question of "how continued litigation or judgment against other members may affect the estate," their roles within Debtor, and their respective wiliness to contribute to

Debtor's reorganization.  In re Bailey Ridge Partners, LLC, No. 17-00033, at 7

(Bankr. N.D. Iowa February 23, 2017).

First, the Court finds a real likelihood of successful reorganization.  Debtor

has identified a clear path for reorganization.  Debtor has a solid contract in place

with Seaboard and is receiving guaranteed revenue under that contract.  This

contract has continued to perform: Debtor now has exclusively Seaboard pigs in its

facilities.  Seaboard's interest in maintaining the contract is clear from its

continued delivery of pigs to Debtor.  Debtor has further shown that it can

probably retool its operation to meet the revenue required to service its debt and

cash flow.  Debtor's members have credibly shown that they are unified and

committed to seeing Debtor successful reorganize.  This factor weighs strongly in

favor of continuing the injunction of the guarantor litigation.

Second, the Court finds that, without an injunction, there is a strong

likelihood of imminent and irreparable harm to the estate.  The close relationship

of the members/guarantors and the Debtor was made clear at the hearing.  The

Members have been willing—and remain willing—to contribute time, money, and

expertise to Debtor's reorganization effort.  The Court found each Member's

explanation of their respective roles within Debtor and commitment to Debtor to

be credible.  Without the Members' ongoing contributions over the past year,

Debtor would likely have ceased operation or at least compromised performance

19

under the Seaboard contract.  If Dubuque Bank's suits against the Members

continued, these roles would likely cease along with Debtor's operation.  They all

noted that, if Dubuque Bank secured judgments and levied on their interests in

Debtor, it would stop their participation in Debtor, prevent additional

contributions, and likely result in bankruptcy for them and a liquidation of Debtor.

The Members' commitment to seeing Debtor successfully reorganize is one

of the key reasons the Court now finds such a real likelihood of reorganization.  If

this support disappeared, so would Debtor's reorganization prospects.  In short, the

Court finds that the members are uniquely able to manage and oversee Debtor's

reorganization, that continued litigation would disrupt these roles, and that all of

the Members expressed an open mind to providing additional capital contributions.

Third, the balance of harms favor of Debtor and Debtor's members.

Dubuque Bank is fully secured by its collateral.  In particular, Dubuque Bank is

secured in Debtor's real estate, which is likely to appreciate.  The record is

undisputed that the demand for pig feeding operations, such as Debtor's, has

increased and will probably continue to increase in the future.  Producers, such as

Seaboard, have built processing facilities in the area.  Debtor's recent

improvements to its facilities mean that it is unlikely to require significant and

costly repair anytime soon.  These recent improvements are likely to last 20 or

more years.  Moreover, facilities like Debtor's that are already operating have

additional value because they have already passed regulatory hurdles, undergone any nuisance litigation, and are generally more established.

Thus, absent an injunction, Debtor's members would probably be subject to significant judgments on guarantees for an entity that has sufficient collateral to cover Dubuque Bank's claim and that—without the continued guarantor litigation—has a strong likelihood of reorganizing. The fact that Dubuque Bank is fully secured by Debtor's collateral is virtually dispositive on this point in and of itself.

Finally, public interest weighs in favor of the staying the Guarantor litigation. There is a strong likelihood that Debtor will be able to pay its claim. Were the guarantor litigation to continue, the Members would almost certainly begin suing Debtor and one another. The prospect of proliferating litigation between the Members—when Debtor may be able to pay Dubuque Bank's wholly secured claim even without resorting to collateral—shows that a stay of the guarantor litigation is in the public interest.

The Court finds that, based on the factors set out in <u>In re Three Seas Realty II, L.L.C.</u>, Dubuque Bank's litigation against the Guarantors should be stayed pending a confirmation hearing on Debtor's plan.

## II.     The South Dakota Litigation

As it relates to the South Dakota litigation, the Court repeats its finding on the first factor—there is a strong likelihood of reorganization in this case.

On the second factor, the Court finds that, without an injunction, there is a likelihood of imminent and irreparable harm to the estate.  Mr. Ruba testified that, if First Dakota obtains a judgment against him and forecloses on his farm land, it would be costly and disruptive to his farming operation and available funds.  Mr. Ruba would immediately seek to recover this cost from Debtor.  The record shows a strong likelihood that he would be entitled to recover this cost.  Thus, given the record, it is almost certain that "a judgment against the third-party defendant [would be] in effect  . . . a judgment or finding against the debtor."  In re Panther Mountain, 686 F.3d at 923.  The fact that Debtor's members joined Mr. Ruba's motion to extend the stay to him is further indication that continuing the South Dakota litigation would be adverse to the estate and Debtor's interest.

On the third factor, the balance of harms favors Mr. Ruba.  Mr. Ruba was assured by First Dakota—and everyone at the March 2011 meeting—that the money would go to Debtor and Debtor would repay the loan.  Debtor has not done so.  Mr. Ruba relied on the Agreement when he signed the loan documents.  Not only was First Dakota aware of the Agreement, First Dakota orchestrated Mr. Ruba's involvement in Debtor.  First Dakota suggested that Mr. Ruba take out a

loan personally, secured by his own land, and receive an ownership interest in exchange.  It told Mr. Ruba that there would be no larger loan to Debtor if he did not sign the personal loan.  Mr. Ruba did not sign the loan out of a desire to invest in Debtor, he did it in an attempt to keep the chance of repayment on another loan (which still hasn't been paid) alive and to help Mr. Ruba redeem his hog bars on the last possible day.

First Dakota's insistence that it was not a part of the Agreement between Mr. Ruba and Debtor, although technically correct based on the signatures at the end of the document, ignores that the Agreement was a part of a larger loan package that all the parties agreed to at the March 2011 meeting.  First Dakota pushed Mr. Ruba to sign the loan through the assurances set out in the Agreement.  First Dakota cannot now credibly disclaim any involvement in the Ruba–Debtor Agreement simply because First Dakota's representatives did not sign it.

If the South Dakota litigation is not stayed, Mr. Ruba will probably lose his farmland and be left with yet another claim against Debtor.  Although First Dakota is certainly entitled to payment, and the security that it negotiated for, First Dakota has not shown why, apart from that entitlement, it needs to proceed with its litigation against Mr. Ruba during the bankruptcy.  The Court finds that the balance of harms falls in favor of Mr. Ruba, not First Dakota.

23

Finally, the public interest factor again weighs in favor of staying the litigation. Debtor's chance for reorganization is real, and Debtor's member have acknowledged that Debtor is obligated to pay the First Dakota loan. Reducing overall litigation and giving Debtor the opportunity to pay First Dakota as the Agreement contemplates, in light of Debtor's strong ability to reorganize, is in the public interest.

The Court finds that, based on the factors set out in In re Three Seas Realty II, L.L.C., the South Dakota litigation against Mr. Ruba should be stayed pending a confirmation hearing on Debtor's plan.

## CONCLUSION

**WHEREFORE**, Debtor's Motion to Extend the Stay is GRANTED and the cases listed in Debtor's Amended Motion to Extend the Stay (Doc. 32) are stayed.

**FURTHER**, the Joint Motion to Extend Stay to Pending South Dakota Matter is GRANTED and case number CIV 16-4007-RAL in the District of South Dakota is stayed.

**FURTHER**, these stays shall continue until the case is dismissed, a plan is confirmed, or the Court so orders.

Dated and Entered:

May 16, 2017

_____

Thad J. Collins
Chief Bankruptcy Judge

24